# In the United States Court of Federal Claims

No. 22-1690
(Filed: September 10, 2025)

```
* * * * * * * * * * * * * * * * * *
                                   *
ROGER T. RICHTER,                  *
                                   *
                    Plaintiff,     *
                                   *
         v.                        *
                                   *
THE UNITED STATES,                 *
                                   *
                    Defendant.     *
                                   *
* * * * * * * * * * * * * * * * * *
```

*Michael E. Shaff*, Irvine Venture Law Firm, LLP, of Irvine, CA, for Plaintiff.

*Elizabeth B. Villarreal*, Trial Attorney, with whom were *Anthony M. Cognasi*, Trial Attorney, *G. Robson Stewart*, Assistant Chief, and *David I. Pincus*, Chief, Court of Federal Claims Section, *David A. Hubbert*, Deputy Assistant Attorney General, Tax Division, U.S. Department of Justice, all of Washington, D.C., for Defendant.

## ORDER AND OPINION

**SOMERS**, Judge.

Plaintiff Roger Richter seeks a refund of allegedly overpaid federal income taxes. In response to Plaintiff's claim, the government filed a counterclaim for outstanding trust fund taxes from a business Plaintiff was associated with, alleging that Plaintiff is liable for these outstanding taxes because he was a responsible person within that business who willfully failed to pay the taxes. Pursuant to Rule 56 of the Rules of the U.S. Court of Federal Claims ("RCFC"), the government moved for summary judgment regarding whether Plaintiff was a responsible person and whether Plaintiff willfully failed to pay the trust fund taxes for the quarters at issue. The government separately moved under RCFC 12(b)(1) to dismiss for lack of subject matter jurisdiction Plaintiff's claim for a tax refund for a particular quarter at issue, arguing that this claim is untimely.

The Court grants in part and denies in part the government's summary judgment motion. The Court denies summary judgment on whether Plaintiff was a responsible person because there is a genuine dispute as to the material fact of whether Plaintiff had the authority to allocate company funds and thereby pay the trust fund taxes that were owed. However, the Court grants summary judgment as to Plaintiff's willful failure to pay the trust fund taxes because Plaintiff

conceded this argument by failing to respond to the government's assertions and there can be no genuine dispute of material fact that Plaintiff had knowledge of the outstanding tax liability and that other creditors were being paid. Additionally, the Court grants the government's motion to dismiss as untimely Plaintiff's refund claim for the first quarter of 2010.

## BACKGROUND

### A.    Factual Background

Plaintiff and his business partners Jim and Frank Cutler were the proprietors of an environmental cleanup firm, Mobile Environmental Technologies ("MET"). *See* ECF No. 19-6 at 5, 6. In 2007, MET merged with a competing business, COBIT-USA, Inc. ("COBIT"), which was run by its CEO and part-owner Patrick Garrett. *See id.* at 9–10. Together, the two companies merged to form MECO Environmental LLC ("MECO"), an environmental cleanup firm based in Portland, Oregon. *Id.* at 10, 21.

MECO's organization consisted of personnel from both MET and COBIT. *Id.* at 9. Additionally, the MECO board of directors consisted of representatives from both companies: Plaintiff and Jim Cutler represented MET, and Garrett and another investor represented COBIT. *See* ECF No. 20 at 4. Plaintiff owned 10% of shares in MET and MET owned 50% of shares in MECO after the merger, making Plaintiff an indirect 5% shareholder in MECO. ECF No. 19-7 at 3. Beginning as early as 2009, Plaintiff served as President of MECO. *Id.* at 5. The other MECO officers included Garrett as CEO, Allen Adams—a certified public account with a history of working for Garrett—as CFO, and Jim Cutler as Secretary. *Id.*; ECF No. 20 at 4. In total, MECO had about seven employees, including its four officers, Sandy Maciel as an administrative assistant, Jesus Solís as vice president of business development, and Leann Harris as a marketing representative. ECF No. 19 at 6.

In 2008, MECO formed ICI Process Technologies LLC ("ICIPT"),[1] a wholly owned subsidiary company created to process spent catalyst from a refinery in Louisiana. ECF No. 20 at 4; ECF No. 19-6 at 14. Management of ICIPT largely mirrored that of MECO, as job titles seemed to remain consistent between the two companies. *See* ECF No. 19-6 at 28–29. Plaintiff retained the title of "President" and his 5% indirect shareholder status in ICIPT. Plaintiff "oversaw the day-to-day remediation operations of ICIPT," ECF No. 20 at 6, "was a co-signer on two checking accounts that ICIPT maintained," *id.* at 7, and overall was more involved with "managing the running of the plant to keep [it] running. . . which also included making sure that vendors got paid . . . so that things wouldn't shut down," ECF No. 19 at 7 (quoting ECF No. 19-6 at 31). According to Plaintiff, the assertion that Plaintiff "ran ICIPT's operations can only be

---

[1] As the government notes, Plaintiff abbreviates "ICI Process Technologies LLC" to "ICI" in early briefing. ECF No. 19 at 2 n.2. The government chose to abbreviate the company to "ICIPT" to avoid confusion with a different company named Industrial Cleanup Incorporated, to which Plaintiff and other individuals associated with this case often refer as "ICI," as well. *Id.* Plaintiff appears to have adopted the "ICIPT" abbreviation for ICI Process Technologies LLC in later briefing. *See generally* ECF No. 20. For clarity, the Court also adopts the abbreviation "ICIPT" to refer to ICI Process Technologies LLC.

read in the proper context," meaning that Plaintiff's oversight of "[operations] at ICIPT meant the business of the company, but not finances." ECF No. 20 at 9, 8–9.

As of February 2010, MECO and ICIPT were struggling financially and nearing bankruptcy. *See* ECF No. 19 at 12. The MECO and ICIPT boards of directors knew about both companies' financial situations. *See* ECF No. 19-6 at 44 ("The board knew exactly what was going on. They knew where the money was short. I mean, they—for any of the board members to not have known that, it would be ridiculous"). As a result of the companies' financial problems, the companies struggled to timely pay vendors. *See, e.g.*, *id.* at 52–53. In one instance, Plaintiff purchased water pumps for the Louisiana plant with personal funds because his company-issued debit card was maxed out. ECF No. 20-1 ¶ 20. Eventually, tax troubles ensued. Ultimately, MECO and ICIPT failed to pay payroll taxes for all four quarters of 2010 and the first quarter of 2011. *See* ECF No. 20 at 4 ("It cannot be disputed that MECO and ICIPT were not current on their federal withholding tax liability during the Periods in Issue.").

**B.    Procedural History**

On November 14, 2022, Plaintiff filed a complaint seeking $411.23 plus interest for overpaid federal taxes for all four quarters of 2010 and the first quarter of 2011. ECF No. 1. On March 20, 2023, the government filed its answer and a counterclaim seeking unpaid trust fund taxes under 26 U.S.C. § 6672 for the periods at issue. ECF No. 7. Therein, the government asserts that Plaintiff is liable for $12,287.22 for the tax period ending March 31, 2010; $39,696.42 for the tax period ending June 30, 2010; $41,970.20 for the tax period ending September 30, 2010; $76,575.45 for the tax period ending December 31, 2010; and $65,201.12 for the tax period ending March 31, 2011. *Id.* at 5. In total, the government seeks $212,454.31 plus interest. *Id.* at 6.

After the conclusion of discovery, on October 15, 2024, the government filed a motion for summary judgment and a partial motion to dismiss. ECF No. 19. The government seeks summary judgment on the issues of whether Plaintiff is a responsible person and whether Plaintiff willfully failed to pay the required taxes under 26 U.S.C. § 6672. *Id.* at 19–23. The government moves to dismiss Plaintiff's claim for tax refunds for the quarter ending March 31, 2010, for lack of subject matter jurisdiction, arguing that such claim is untimely under 26 U.S.C. § 6511. *Id.* at 23–25.

On November 15, 2024, Plaintiff filed his response to the government's motions, ECF No. 20, as well as a statement of disputed facts, ECF No. 20-1. The government filed its reply brief on December 2, 2024. ECF No. 21. The Court held oral argument on the government's motions on March 5, 2025. The motions are now ripe for adjudication.

## DISCUSSION

**A.    Legal Standard**

Under RCFC 56, a party may move for summary judgment and the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." If the record could not lead a rational trier of fact to rule in favor of the nonmoving party, then there is no genuine dispute as to any material fact, and the Court must grant the motion. *Dallin ex rel. Estate of Young v. United States*, 62 Fed. Cl. 589, 595 (2004) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A "material fact" is one that might significantly affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

      In most cases involving motions for summary judgment, the moving party has the initial burden of demonstrating either the absence of any genuine issue of material fact or the absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, the burden of proof in a motion for summary judgment for a case that involves a tax controversy functions differently. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935). With respect to tax cases, once the government has made a prima facie case, "both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff." *Pototzky v. United States*, 8 Cl. Ct. 308, 315 (1985). For the government to establish a prima facie trust fund tax violation, it need only introduce an Internal Revenue Service ("IRS") assessment into evidence, as "IRS assessments are entitled to a presumption of correctness." *Michaud v. United States*, 40 Fed. Cl. 1, 15 (1997) (citing *Ghandour v. United States*, 36 Fed. Cl. 53, 59 (1996)). In such cases, "the general rule is that [the] plaintiff must prove by a preponderance of the evidence that he is *not* a 'responsible person' [or *not* 'willful'] and thus [the government's] assessment is erroneous." *Pototzky*, 8 Cl. Ct. at 315 (emphasis added).

      Notwithstanding the unique nature of summary judgment burdens in a tax case, a plaintiff may still defeat the motion by citing to particular materials in the record or by showing that the materials cited by the government establish a genuine dispute as to whether the plaintiff is a responsible person or was willful in his non-payment. *See* RCFC 56(C)(1)(A), (B). Generally, to prevail by demonstrating that a genuine issue for trial exists, the plaintiff "cannot rest on the mere allegations or denials of his pleading," *Banks v. United States*, 62 Fed. Cl. 778, 780 (2004), but instead must "go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions." *Dallin ex rel. Young*, 62 Fed. Cl. at 596 (citing *Celotex Corp.*, 477 U.S. at 324). In other words, once the government has made its prima facie case, the plaintiff must present "sufficient evidence to raise a question as to the outcome of the case" to survive the motion for summary judgment. *Id.* at 595.

      Moreover, a plaintiff seeking a refund of taxes paid must bring suit within two years "from the time the tax was paid." *RadioShack Corp. v. United States*, 566 F.3d 1358, 1361 (Fed. Cir. 2009) (quoting 26 U.S.C. § 6511(a)). Importantly, section 6511(a) "is jurisdictional in nature, and a suit that fails to satisfy this provision must be dismissed for lack of subject matter jurisdiction," under RCFC 12(b)(1). *Orlova v. United States*, 347 Fed. App'x 578, 580 (Fed. Cir. 2009); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the [claim] in its entirety.").

**B.**    **Analysis**

      Presently before the Court are two dispositive motions filed by the government. First, the government moved for summary judgment regarding whether, under 26 U.S.C. § 6672, Plaintiff

is a responsible person and whether Plaintiff willfully failed to remit taxes to the government. Second, the government filed a partial motion to dismiss under RCFC 12(b)(1) alleging that one of Plaintiff's claims is untimely under 26 U.S.C. § 6511 and, therefore, must be dismissed. The Court addresses these motions in the order presented.

### 1. Summary Judgment Regarding Responsibility and Willfulness

Several provisions of the Internal Revenue Code require employers to withhold taxes from individual employees' paychecks and remit those taxes to the IRS, "commonly referred to as 'trust fund taxes.'" *Slodov v. United States*, 436 U.S. 238, 243 (1978); *see, e.g.,* 26 U.S.C. §§ 3102, 3402, 7501. Between their time of collection and remittance to the IRS, these taxes may be permissibly intermingled with an employer's other funds. *Slodov*, 436 U.S. at 243. The Supreme Court has observed that, given this permissible intermingling, such "funds . . . can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Id.* Regardless of whether the employer remits the withheld taxes to the IRS, those taxes are credited to the employee. *Id.*

If an employer "willfully fails to collect" or remit trust fund taxes that are credited to an employee, 26 U.S.C. § 6672 empowers the IRS to impose "a penalty equal to the total amount of the tax evaded" on "[a]ny person required to collect, truthfully account for, and pay over" trust fund taxes. 26 U.S.C. § 6672(a). A "person," as defined by the statute, is "an officer or employee of a corporation . . . [who] is under a duty to perform the act in respect of which the violation occurs." *Id.* § 6671(b). A person is subject to this penalty if two separate statutory requirements are satisfied. First, a taxpayer is a "responsible person" if he or she was under a duty "'to collect, truthfully account for, and pay over' any taxes." *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir. 1984) (quoting 26 U.S.C. § 6672). Second, a "'responsible person' must have 'willfully' failed to collect, truthfully account for, and pay over, or have 'willfully' evaded or defeated the tax payment." *Id.* "[B]oth statutory requirements must be present for the [] penalty to be imposed." *Id.* In order toTo avoid liability for the trust fund penalty that the IRS has assessed, "the taxpayer carries the burden of proving by a preponderance of the evidence that [at least] one of these [two] elements is not met." *Rosenheim v. United States*, 159 Fed. Cl. 559, 565 (2022) (citing *Noffke v. United States*, 129 Fed. Cl. 341, 355 (2016); *Jenkins v. United States*, 101 Fed. Cl. 122, 131 (2011), *aff'd*, 484 F. App'x 511 (Fed. Cir. 2012)). The Court discusses these statutory requirements in the order presented.

#### a. Responsible Person

To determine whether a plaintiff is a responsible person under section 6672, the "overwhelming weight of case precedent requires the factfinder to look through the 'mechanical functions of the various corporate officers,' to determine the persons having 'the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its . . . tax obligations.'" *Godfrey*, 748 F.2d at 1575 (citation omitted) (first quoting *White v. United States*, 372 Ct. Cl. 765, 773 (1967); then quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir. 1975)). Put differently, a responsible person is anyone who is "in fact responsible for controlling corporate disbursements," or who has "the final word as to what bills should or should not be paid, and when." *Id.* (emphasis omitted) (first quoting *Pac. Nat'l*

*Ins. Co. v. United States*, 422 F.2d 26, 30–31 (9th Cir. 1970); then quoting *Wilson v. United States*, 250 F.2d 312, 316 (9th Cir. 1958)).

More than one person may be found to be a responsible person, such that having the "final word" simply means "significant rather than exclusive control over the disbursal of funds." *Adams v. United States*, 504 F.2d 73, 75 (7th Cir. 1974); *Dudley v. United States*, 428 F.2d 1196, 1201 (9th Cir. 1970). In cases in which multiple people are involved in controlling corporate disbursements, liability attaches to "'any' responsible persons, . . . not just to the person *most* responsible for the payment of the taxes." *Jenkins*, 101 Fed. Cl. at 132 (emphasis in original) (quoting *Barnett v. Internal Revenue Serv.*, 988 F.2d 1449, 1455 (5th Cir. 1993)); *see also Schultz v. United States*, 918 F.2d 164, 167 (Fed. Cir. 1990); *Gephart v. United States*, 818 F.2d 469, 476 (6th Cir. 1987) ("Section 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs."). Thus, the key question in a responsible person analysis is "whether [the person] possessed the effective power to pay the taxes or, at least, to force that action on the part of others." *Jenkins*, 101 Fed. Cl. at 133.

The Federal Circuit has underscored that determining whether an individual is a responsible person is "a test of substance, not form," citing an array of indicia of responsibility— such as check signing authority, day-to-day fiscal management, the ability to pay or not pay creditors, significant power over voting stock, and control over payroll—that, when taken together, generally amount to a finding that a person is "responsible." *Godfrey*, 748 F.2d at 1576. Other circuits have enumerated similar indicia, such as whether someone is viewed as a de facto boss, *Neckles v. United States*, 579 F.2d 938, 940 (5th Cir. 1978); whether he or she successfully paid withholding taxes in a different quarter, *Brown v. United States*, 464 F.2d 590, 591 (5th Cir. 1972); or whether he or she is the person creditors look to for payment, *Monday v. United States*, 421 F.2d 1210, 1215 (7th Cir. 1970). Importantly, this factual inquiry is "determined in the totality of the circumstances; no single factor is determinative." *Gann v. United States*, 121 Fed. Cl. 482, 488 (2015).

Instructive to adjudicating this case is *Rosenheim v. United States*, 159 Fed Cl. 559 (2022). In that case, Rosenheim moved for summary judgment on the question of whether he was a responsible person who willfully failed to pay taxes under section 6672. *Id.* at 561, 565. Rosenheim argued that while he did have authority to sign checks on behalf of his company, "he only did so on an 'exceedingly rare' basis and 'only for payments that had been approved by accounting personnel.'" *Id.* at 566. Rosenheim argued that these facts established that his involvement and control of with the company's finances was "minimal, rare and not as a decision-maker." *Id.* The government opposed these arguments by citing to instances in the record suggesting that Rosenheim's involvement in the company's finances was greater than he let on. *Id.* Judge Campbell-Smith determined that summary judgment on this issue was not appropriate because a determination had to be made as to what the "guidelines for [Rosenheim's] ability to make payments" were and "the breadth of [his] power to advise and recommend a course of action to the board" regarding making payments. *Id.* at 567. In denying summary judgment, Judge Campbell-Smith observed that "[t]his kind of inquiry . . . is not possible on the conflicting evidence currently before the court." *Id.*

In this case, the government asserts that the question of whether Plaintiff was a responsible person can be resolved by summary judgment. ECF No. 19 at 19–21. In furtherance of this argument, the government points to various facts that tend to establish that Plaintiff is a responsible person. The government emphasizes that Plaintiff was "president" and a shareholder of MECO and ICIPT, *id.* at 4; was a signatory on company bank accounts, *id.* at 20–21; had the ability to hire employees, *id.* at 8; had the ability to direct payments, *id.* at 9–10, 20; had a company debit card that he "could use to make work-related purchases without preauthorization," *id.* at 9; and could negotiate contracts on behalf of the company, *id.* at 10.

Conversely, Plaintiff argues that he was not a responsible person under the statute and supports this argument by disputing or qualifying the facts that the government asserts establish responsibility. For example, Plaintiff does not contest that he held the "mere title of president," but denies that he had any "actual authority over any executive decisions of ICIPT." ECF No. 20-1 ¶ 5. Plaintiff does not dispute that he had signatory power for company checks but argues that he only "signed forty-three checks out of thousands of financial transactions" over the five quarters at issue and only did so "on request if Garrett [was] travelling and [Jim] Cutler needed someone to co-sign a check that he had had Allen Adams, the chief financial officer, prepare." ECF No. 20 at 6. Furthermore, regarding check-writing, Plaintiff emphasizes that for a company check to be valid, two signatures were required, and Plaintiff had no authority to originate a payment. ECF No. 20-1 ¶ 2. Plaintiff does not dispute that he had hiring authority but states that he could only hire employees for the plant in Louisiana and had no personnel management authority in the company's headquarters in Oregon. *Id.* ¶ 14. Plaintiff concedes that he could direct payments but any such direction above a certain amount would have to be authorized by other company officers. *Id.* ¶ 22. Plaintiff concedes that he had authority to use the MECO company debit card for business travel and lodging, but such authority depended on approval from Garrett or Adams. *Id.* ¶ 20. Plaintiff also does not dispute his ability to negotiate contracts on behalf of the company but states that he would not have done so without Garrett's approval as to not "mak[e] a misstep." *Id.* ¶ 19.

These indicia cut in favor of finding Plaintiff responsible under the statute, but they are merely *indicia*, none of which is determinative. *Gann*, 121 Fed. Cl. at 488. Notwithstanding the fact that most of the indicia of a responsible person are present, there still exists a genuine dispute of material fact. A critical reading of Plaintiff's arguments and proffered evidence suggest a genuine dispute as to Plaintiff's effective power to direct company funds to other creditors in preference to the company's payroll tax obligations.

The genuine dispute of material fact regarding Plaintiff's power to direct payments arises when looking at the structure of the company. MECO was formed through a merger of MET and COBIT. ECF No. 19-6 at 9–10. As part of the terms of that merger, company checks required the signatures of officers from both MET (Plaintiff or Jim Cutler) and COBIT (Patrick Garrett or Allen Adams) to prevent either side from possessing more power over the other when it came to finances. *See* ECF No. 20-1 ¶ 7 ("Again, it goes back to the kind of two—dual signatures or agreement from both companies to send big wires."). The relevancy of this corporate structure comes into play when considering Plaintiff's contention that he only signed a minority of checks at the direction of Garrett or Cutler and that Adams could only countersign those checks if he got approval from Jim Cutler to do so. ECF No. 20 at 8–9. For example, if Adams could

countersign a check signed by Plaintiff without further approval from Jim Cutler, Plaintiff would be a responsible person under the statute because an MET officer (Plaintiff) and a COBIT officer (Adams) could therefore obligate company funds.  However, if Adams could not countersign a check signed by Plaintiff without Jim Cutler's approval, Plaintiff is likely not a responsible person because, although Plaintiff would be providing the necessary MECO signature, that signature would not have represented MECO approval for the check such that Adams (or Garrett) would still need Jim Cutler's approval before countersigning the check.  In other words, under Plaintiff's argument, Plaintiff's signature might have been sufficient for the bank to honor the check but, within ICIPT, his signature without Jim Cutler's approval for the expenditure was meaningless.

Much like in *Rosenheim*, Plaintiff's proffered evidence illustrates a genuine dispute as to the material fact of whether Adams required Jim Cutler's approval to countersign checks signed by Plaintiff.[2]  First, Plaintiff's deposition testimony is consistent with the argument that Adams needed Jim Cutler's approval to execute payments ordered by Plaintiff and that even if Plaintiff had "expressly advised Adams to pay taxes, Adams . . . would have required Jim Cutler's approval."  *See* ECF No. 20-1 ¶ 37.  For example, when asked whether Adams would have checked in with Plaintiff before initiating fund transfers, Plaintiff responded, "it wouldn't be uncommon for [Adams] to check with me, but, ultimately, when it came to moving money, those kind of things, . . . it would go through [Patrick Garrett's] approval and Jim Cutler's approval."  ECF No. 20-6 at 3.  When asked whether Adams would have sought Plaintiff's approval not to pay payroll taxes, Plaintiff responded that Adams would not have gone to Plaintiff for such approval, but instead would have sought "Patrick [Garrett] or Jim Cutler" for approval and that he did not think "Jim [Cutler] would have [given his approval] without Patrick [Garrett's] agreement" because such payments "go back to the kind of two[] dual signatures or agreement from both companies to send big wires."  *Id.* at 11.  Lastly, when asked whether Plaintiff had ever sought payment for water pumps he purchased with personal funds on behalf of the company, Plaintiff responded that "[e]ven though it was a legitimate expense," he "just didn't have the authority" to reimburse himself, even if the company had had the money.  *Id.* at 5.

Furthermore, Adams' deposition testimony also casts doubt on whether Plaintiff could have directed payments without Jim Cutler's approval.  Adams testified regarding an email sent by Plaintiff:

> If [Plaintiff] contacted me and said, Pay this, you know, I would pay it.  I would set it up to be paid, and then Jim [Cutler] would then approve it.  Now, Jim [Cutler] is not copied on this email.  So I would have had to have called him or sent a separate email saying, Hey, [Plaintiff] contacted me.  I—I set up this wire.  Can you go ahead and approve it?"

ECF No. 20-5 at 15.  Similarly, when shown an email and asked whether Plaintiff had "the authority to order [Adams] to send the money to ICI[PT] so that ICI[PT] could pay [ICIPT]'s

---

[2] Neither party furnished the record with a complete deposition transcript.  From the deposition excerpts filed, the Court draws the conclusion that there exists a genuine dispute of material fact regarding Plaintiff's power to direct payments.

payroll," Adams responded, "[y]eah. And you can see that Jim Cutler is copied on [the email]." *Id.* at 12. Counsel followed up by asking, "[w]ould Jim [Cutler] need to approve it?" *Id.* Adams replied, "oh, yes." *Id.* Lastly, when asked about an email he received from Plaintiff indicating that they "need to send [$]39,000 to ICI[PT] today for [ICIPT] payroll," Adams testified that Plaintiff "copied . . . Jim Cutler on this [email] again because he knows I can't do the wire without Jim [Cutler's] authorization." *Id.* at 17.

The government contends that the testimony recounted above amounts to Plaintiff's attempt to "shift the blame onto other people in the company, here, Jim Cutler and Patrick Garrett." ECF No. 21 at 3. This blame-shifting, according to the government, is futile as there "can be—and indeed often are—multiple responsible people in one business." *Id.* While it is true as a general matter that there can be multiple responsible persons under the statute, Plaintiff's proffered testimony tends to establish that Jim Cutler was the responsible person with authority to direct payments, not Plaintiff. In other words, the proffered testimony does not seem to suggest that Jim Cutler *or* Plaintiff could direct funds; it suggests that Plaintiff *could not direct funds without Jim Cutler's approval*. If this assertion is true, Plaintiff would likely not be a responsible person under the statute because Jim Cutler would then be the person ultimately authorized to obligate funds for MECO. Therefore, although there can be multiple responsible persons, Plaintiff likely would not be one of those responsible persons because he would not share the power to direct funding with Jim Cutler but instead would only have the power to pay expenses Jim Cutler authorized him to pay. Such power would not constitute the "effective power to pay the taxes or, at least, to force that action on the part of others," *Jenkins*, 101 Fed. Cl. at 133, as Plaintiff would not have the ability to pay the taxes himself, or to order Adams to pay the taxes, without Jim Cutler's approval. Thus, Plaintiff would lack the effective power required to find him responsible under the statute. This is a genuine dispute as to a material fact.

Even though the weight of the evidence cuts in the government's favor in that many indicia of a responsible person are present, and the deponents cited by Plaintiff may lack credibility given their sometimes-conflicting responses and self-preserving motives,[3] Plaintiff's proffered evidence establishes a genuine dispute of material fact as to whether Plaintiff could have directed payments without approval from another officer.[4] Like in *Rosenheim*, given the conflicting evidence presented in the record, the Court cannot determine what the "guidelines" for Plaintiff's ability to make payments included or the breadth of Plaintiff's power to direct a course of action to the other officers regarding payments. *See* 159 Fed. Cl. at 567. Therefore,

---

[3] Although the weight of the evidence leans heavily in the government's favor, in "adjudicating a motion for summary judgment, the Court may not make credibility determinations or weigh the evidence." *Jackson v. United States*, 122 Fed. Cl. 376, 380 (2015); *Univ. of S. Fla. v. United States*, 146 Fed. Cl. 274, 285–86 (2019). Such determinations are to be made at trial.

[4] Putting aside Plaintiff's vast inclusion of deposition testimony regarding irrelevant character evidence—such as descriptions of certain of Patrick Garrett's lifestyle choices—Leann Harris's testimony also cuts against a finding that Plaintiff had the power to direct payments. ECF No. 20-1 ¶ 17 ("Q. Did you ever see [Plaintiff] signing checks? A. No. I would never—[Plaintiff] is not somebody that I would have gone to to do anything with money.").

the Court cannot grant summary judgment on this issue because there remains a genuine dispute of material fact that must be resolved at trial.

### b. Willfulness

The second requirement for liability under section 6672 is a showing that the taxpayer "willfully fail[ed] to collect [the] tax, or truthfully account for and pay over such tax, or willfully attempt[ed] in any manner to evade or defeat any such tax or the payment thereof." 26 U.S.C. § 6672(a). A finding of "willfulness" under section 6672 requires "proof of a voluntary, intentional, and conscious decision not to collect and remit taxes," rather than proof of intent to "defraud or deprive" the government of funds. *Godfrey*, 748 F.2d at 1577 (quoting *Scott v. United States*, 173 Ct. Cl. 650, 656 (1965)). "Willful conduct may also include a reckless disregard of an 'obvious and known risk' that taxes might not be being remitted" to the government. *Id.* (quoting *Feist v. United States*, 221 Ct. Cl. 531, 542 (1979)). Therefore, willfulness can be demonstrated either by evidence of "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government," or "a reckless disregard of an 'obvious and known risk' that taxes might not be remitted" including "by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." *Godfrey*, 748 F.2d at 1577 (quoting *White*, 372 F.2d at 521), 1578 (quoting *Mazo v. United States*, 591 F.2d 1151, 1155 (5th Cir. 1979)). In short, "evidence that the responsible person had knowledge of payments to other creditors after he was aware of the failure to pay withholding tax is sufficient for summary judgment on the question of willfulness." *Mazo*, 591 F.2d at 1157.

Here, the government argues that it is entitled to summary judgment on the issue of whether Plaintiff's conduct was willful under section 6672 because Plaintiff knew of ICIPT's tax liabilities and yet still failed to perform his duty of remitting taxes to the government. ECF No. 19 at 22–23. In response to the government's motion, Plaintiff filed a thirty-nine-paragraph-long statement of disputed facts, ECF No. 20-1; however, upon review, it is clear that none of these paragraphs directly respond to the government's willfulness argument.

For example, in paragraph 37, Plaintiff includes the government's statement that "although [Plaintiff] denies acting willfully, [he] does not deny knowing about the unpaid taxes, at least in broad terms." *Id.* ¶ 37 (quoting ECF No. 19 at 17). Plaintiff responds: "Jim Cutler made that kind of decision . . . But even if [Plaintiff] had expressly advised Adams to pay taxes, Adams testified he would have required Jim Cutler's approval." *Id.* This response, however, is nonresponsive as to willfulness because it does not dispute Plaintiff's knowledge of the unpaid taxes. Instead, it addresses whether Plaintiff was a responsible person, as it deals with who had authority to approve payments, not whether Plaintiff had knowledge of the unpaid taxes for willfulness purposes. Similarly, in paragraph 33, Plaintiff quotes the government's factual assertion that "[t]he board knew exactly what was going on. They knew where the money was short." *Id.* ¶ 33 (quoting ECF No. 19 at 13). Plaintiff responds that this assertion is "true in general" before citing deposition testimony regarding whether Plaintiff had the authority to decide to stop paying the IRS. *Id.* Once again, Plaintiff's response sheds light on Plaintiff's authority to authorize payments, not whether Plaintiff knew about the unpaid taxes. Furthermore, in paragraph 7, Plaintiff includes the government's statement that Plaintiff "was responsible for withholding and remitting ICIPT's employees' employment taxes to the IRS, and

10

he willfully failed to do so." *Id.* ¶ 7 (quoting ECF No. 19 at 4). Plaintiff counters: "This statement is just a fabrication without any basis. Plaintiff was not responsible for withholding and remitting for ICIPT's employment taxes. Plaintiff had nothing to do with collecting and remitting any taxes. Plaintiff's duties and responsibilities at ICIPT did not include paying any payable." *Id.* As is now a pattern, Plaintiff's response disputes the first clause of the government's statement—arguing that Plaintiff's duties did not involve withholding and remitting employment taxes—yet remains silent on whether Plaintiff acted willfully because the response does not address whether Plaintiff had knowledge of the unpaid taxes. *Id.*

Additionally, Plaintiff did not address willfulness at oral argument. The Court articulated its understanding that, due to Plaintiff's failure to respond to the government's willfulness argument in his briefs, any argument regarding willfulness is deemed to be waived. *See* Oral Argument Recording at 0:59–1:44. Nonetheless, the Court stated that it was willing to hear Plaintiff's arguments on this point, *see id.* at 1:30–1:41, but Plaintiff chose not to address it. Therefore, not only did Plaintiff fail to address the government's willfulness argument in his briefs, but he also failed to counter this assertion at oral argument.

In sum, Plaintiff failed to materially address willfulness in his responsive briefing and at oral argument. None of Plaintiff's responses to the facts regarding willfulness that the government asserts are undisputed speak to whether Plaintiff made "a deliberate choice voluntarily, consciously, and intentionally . . . to pay other creditors instead of paying the Government" or negate the allegation that Plaintiff had a "a reckless disregard of an 'obvious and known risk' that taxes might not be remitted," including "by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." *Godfrey*, 748 F.2d at 1577 (quoting *White*, 372 F.2d at 521), 1578 (quoting *Mazo v. United States*, 591 F.2d 1151, 1155 (5th Cir. 1979)). Unfortunately for Plaintiff, a "party's failure to raise an argument in an opening or responsive brief constitutes waiver." *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58–59 (2021). Therefore, Plaintiff has waived any willfulness argument, and the Court must grant summary judgment on this issue in the government's favor.

Even if Plaintiff had responded to the government's willfulness argument, the undisputed facts make it abundantly clear that Plaintiff knew about the tax responsibility and knew that ICIPT paid other creditors in preference to the IRS, or at the very least had a reckless disregard of an obvious and known risk that the taxes went unpaid, while other creditors were being paid. In furtherance of its motion, the government points to multiple emails demonstrating Plaintiff's knowledge of ICIPT's unpaid taxes. ECF No. 19-5. For example, on March 17, 2010, Adams advised Garrett and Plaintiff in an email not to pay the full amount of payroll taxes and to instead prioritize other bills. *Id.* at 3 ("I think we should hold off on payroll and the taxes to help Keith pay bills but just let me know."). On April 19, 2010, Maciel sent Plaintiff, copying Adams, an email marked with "high" importance reporting the outstanding accumulation of payroll taxes totaling $34,387.14. *Id.* at 5–6. About a month later, on May 14, 2010, Maciel emailed Jim Cutler, copying Garrett, Adams, and Plaintiff, updating them on the outstanding payroll taxes. *Id.* at 7. Specifically, Maciel listed ICIPT's payroll tax liabilities and net paychecks for the pay periods ending February 28, March 15, March 31, April 15, and April 30, 2010. *Id.* She provided an explicit figure for the payroll taxes, not including net paychecks, for the pay periods ending February 28 and April 15, 2010, in the amount of $7,928.96 and $8,635.22, respectively.

*Id.* On June 3, 2010, Adams emailed Plaintiff, Garrett, and Maciel, informing them that they risked losing the services of their payroll processor, ADP. *Id.* at 8. In that email, Adams stressed the importance of retaining ADP's services, stating that if they lost that service, they would have to "secure a viable alternate which [would] be time consuming and expensive given how far behind [they were] on all payrolls (taxes and net paychecks) and that [they] operate in multiple States with two companies (MECO and [ICIPT])." *Id.* On July 20, 2010, Jim Cutler emailed Frank Cutler, Plaintiff, Garrett, and Adams explaining how the company could spend a one-million-dollar bridge loan, explicitly noting that some of that money could be used to pay tax liabilities. *Id.* at 11 ("Here is what the million would go for: [$]350,000 . . . Past due payroll for [Patrick Garrett], [Plaintiff], Allen [Adams] and Fred for past due payroll taxes at [ICIPT] and Meco."). On November 10, 2010, Adams wrote to Plaintiff summarizing net paycheck and expense amounts, mentioning that the total figure "does not include the payroll taxes withheld and employers [sic] portion of payroll taxes all of which have not as yet been paid." *Id.* at 13. On January 3, 2011, Adams wrote to Plaintiff, seemingly following up on a conversation about the unpaid payroll taxes: "As requested, the following is the situation on unpaid payroll taxes (Federal, State and Local): 1) As you know, payroll taxes for the year 2010 are owing by MECO and [ICIPT]." *Id.* at 14.

Moreover, with the knowledge that the payroll taxes were owed to the IRS, Plaintiff signed multiple checks authorizing MECO and ICIPT to pay creditors other than the United States. This establishes willfulness. Indeed, the Federal Circuit has affirmed a willfulness determination based on "evidence that after learning that [the defaulting company] may have been deficient in paying the trust fund taxes, [plaintiff] signed 13 checks on [the company] accounts that were payable to creditors other than the United States." *Jenkins v. United States*, 484 F. App'x 511, 516 (Fed. Cir. 2012). A showing of willfulness may be made by putting forth "[e]vidence that the responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes . . . ." *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir. 1991); *see also Howard v. United States*, 711 F.2d 729, 736 (5th Cir. 1983); *Mazo*, 591 F.2d at 1157 ("[E]vidence that the responsible person had knowledge of payments to other creditors after he was aware of the failure to pay withholding tax is sufficient for summary judgment on the question of willfulness."); *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976) ("By dissipating the cash for new purchases, of which the taxpayers knew, they unwittingly supplied the necessary willfulness."). Stated differently, meeting the willfulness requirement necessitates first, a showing that the taxpayer was aware of the delinquency, and second, a showing that the taxpayer favored paying other creditors over the IRS. *See Godfrey*, 748 F.2d at 1577–78; *Powell v. United States*, 9 Cl. Ct. 58, 62 (1985) ("[W]illfulness may be shown by proving that the responsible person used available corporate money for other business purposes."); *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992) ("The 'intentional preference of other creditors' over the United States is 'sufficient to establish the element of willfulness' under section 6672(a)." (quoting *United States v. Pomponio*, 635 F.2d 293, 298 n.5 (4th Cir. 1980))). Even when there is little or no money available to pay the taxes owed, the individual has a responsibility to "prorate such funds as are available between the Government and the employees." *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir. 1975); *see also Hochstein v. United States*, 900 F.2d 543, 548 (2d Cir. 1990); *Emshwiller v. United States*, 565 F.2d 1042, 1045–46 (8th Cir. 1977); *United States v. Gilbert*, 266 F.3d 1180, 1185 (9th Cir. 2001).

As the undersigned noted in a similar recent case, granting summary judgment on the question of willfulness, while denying summary judgment on responsibility, seems to be an uncommon holding in trust fund penalty cases. *See Warnement v. United States*, __ Fed. Cl. __, 2025 WL 1763236, at *15 (2025) (collecting cases). Nonetheless, Plaintiff's waiver regarding willfulness, and the extensive email record demonstrating Plaintiff's willfulness, requires the Court to grant summary judgment on the willfulness prong, despite a genuine dispute of material fact regarding responsibility. As with the undersigned's decision in *Warnement*, if Plaintiff is determined to be a responsible person at trial, his willfulness under section 6672 will directly flow from the responsibility determination based on this grant of summary judgment regarding willfulness.

### 2. Plaintiff's Claim for a Tax Refund for the Quarter Ending March 31, 2010, is Untimely.

The government filed a motion to dismiss Plaintiff's tax refund claim for the quarter ending March 31, 2010, for lack of subject matter jurisdiction. ECF No. 19. Therein, the government argues that the Court lacks subject matter jurisdiction because this claim is untimely under 26 U.S.C. § 6511. *Id.* at 23–25. Under the relevant provision of that statute, a "[c]laim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within . . . 2 years from the time the tax was paid." 26 U.S.C. § 6511(a). Because Plaintiff paid his trust fund liabilities for the quarter at issue, the government argues that Plaintiff must have filed his claim within two years from the time he made that payment and that he failed to do so. ECF No. 19 at 24–25. According to the government, Plaintiff made his final payment for outstanding taxes for the quarter at issue on June 18, 2018; therefore, he had to have filed any claim for a tax refund on or before June 18, 2020, for his claim to be timely. *Id.* Instead, because Plaintiff filed this case on February 16, 2021, the government asserts that his claim is untimely and, therefore, should be dismissed. *Id.* at 25 (citing ECF No. 1-1 ¶ 3).

Plaintiff did not respond to the government's argument either in his briefs or at oral argument, despite the Court's characterization that this claim would be waived if Plaintiff did not address it. *See* Oral Argument Recording at 0:36–0:47. As mentioned earlier, a "party's failure to raise an argument in an opening or response brief constitutes waiver." *Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59. Because Plaintiff did not respond to this argument, Plaintiff waived any response and thereby conceded the government's assertions.

It is likely that Plaintiff failed to address the government's statute of limitations argument because Plaintiff's refund claim for the first quarter of 2010 is plainly untimely.[5] The statute

---

[5] 26 U.S.C. § 6511(a) requires any claim for credit or refund of an overpayment of any tax to be "filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." As the government notes, any "'tax returns' in the trust-fund penalty context" would be untimely because Plaintiff filed such returns for the quarter at issue in 2010 and did not initiate this suit until 2021, which far exceeds the three-year window prescribed by the statute. ECF No. 19 at 25 n.6. Plaintiff did not

makes clear that a claim for a tax refund must be filed within two years from the time the tax was paid.  *See* 26 U.S.C. § 6511(a).  Plaintiff made his final payment for the taxes assessed for the quarter at issue on June 18, 2018; accordingly, he must have filed his refund claim on or before June 18, 2020, for such claim to be timely.  Plaintiff filed his claim on February 16, 2021, *see* ECF No. 1-1 ¶ 3, a date well beyond the two-year filing window prescribed by the statute.  Thus, his claim is untimely, and the Court is without subject matter jurisdiction to hear it.  The Court grants the government's motion to dismiss Plaintiff's tax refund claim for the quarter ending on March 31, 2010.

## CONCLUSION

For the foregoing reasons, the Court **DENIES IN PART** the government's motion for summary judgment as to Plaintiff being a responsible person under 26 U.S.C. § 6672, and the Court **GRANTS IN PART** the government's motion for summary judgment as to willfulness.  On or before **October 10, 2025**, the parties **SHALL** file a joint status report proposing a schedule for pretrial proceedings in accordance with Part VI of Appendix A of the Rules of the U.S. Court of Federal Claims.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

---

respond to this argument.  For this reason, the Court limits discussion of timeliness under section 6511 to the two-year window after the tax was paid.